Cite as 2014 Ark. App. 645

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-14-100

| | | |
|---|---|---|
| | | **Opinion Delivered** NOVEMBER 12, 2014 |
| GARY SHARP | | APPEAL FROM THE SEVIER |
| | APPELLANT | COUNTY CIRCUIT COURT |
| | | [NO. PR11-62-1] |
| V. | | |
| | | HONORABLE TOM COOPER, |
| | | JUDGE |
| JAMES SHARP | | |
| | APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

This is an appeal concerning the probate of Dulaney Elbridge ("D.E.") Sharp's last will and testament executed on June 4, 2010 (hereinafter referred to as the "2010 will"), and the effect of a no-contest clause contained within that will. The relevant parties are D.E.'s two sons, appellant Gary E. Sharp and appellee James Sharp. The 2010 will gave James substantially more assets than Gary. Gary alleged below that the 2010 will should be declared invalid because D.E. did not have testamentary capacity; that James exerted undue influence over D.E.; and that James procured the 2010 will. After a trial on the merits, the trial court ruled that the 2010 will was valid and that the no-contest clause contained therein was enforceable. Gary appeals the Sevier County Circuit Court's rulings, specifically contending that the trial court (1) erred by finding that Gary's will contest was without "good faith," and thus was not exempted from the will's no-contest clause, and (2) applied an incorrect burden

of proof regarding the will's validity. We affirm because Arkansas law does not provide for a "good faith" exception to a valid will's no-contest clause in this factual situation and because the trial court did not commit reversible error in its application of the burden of proof to the evidence.

Most of the relevant facts are not in dispute. D.E. Sharp and his wife, Delta Sharp, executed reciprocal wills in 2007 giving all assets to the surviving spouse and also providing that, after certain specific bequests to the sons, the residue of the surviving spouse's estate would be divided equally between sons James and Gary. Delta Sharp died in April 2010.

D.E. was in declining health and suffered from a variety of maladies including an occasional inability to ambulate. Not long after Delta's death, D.E. visited with his long-time attorney, Randell Wright, to modify his estate plan. Attorney Wright testified that he did not see James during D.E.'s planning visit; Wright spent an hour and fifteen minutes in his office with D.E. going over his assets and the estate-planning options available to D.E. The meeting concluded.

On June 2, 2010, Wright's secretary called D.E. to advise him that the new will was ready for execution. On June 4, 2010, D.E. returned to Wright's office to execute the new will. James drove his father to the law office that day. Attorney Wright testified that James stuck his head in the door of the law office and asked if D.E. could execute his will in the car because his knee was hurting. James returned to the car. Shortly thereafter, Wright and his secretary, Brandi Carver, went outside to the car with the new documents. James was sitting behind the wheel, and D.E. was sitting in the front passenger seat. D.E. opened the door,

swung his legs out of the passenger door, and exchanged pleasantries. Wright needed a second witness because Carver was going to notarize the signatures. Attorney Wright handed D.E. a copy of the 2010 will to review while Wright went next door to the post office and asked the postmaster, Alan Roden, to witness a will. They returned, and D.E. then executed his 2010 will before two witnesses (attorney Wright and postmaster Roden) as well as a notary public (secretary Carver). None of the witnesses recalled James speaking at all during this process.

In the 2010 will, D.E. recognized that his wife had predeceased him and that he had two sons: James, who lived nearby in Lockesburg, Arkansas, and Gary, who lived in Prosper, Texas. D.E. selected James to be the appointed executor of his estate. The 2010 will provided for a specific bequest to Gary of "the round hard rock maple dining table and six chairs and the sum of $100,000 to be his absolutely and forever." The 2010 will provided for a specific bequest to James of

> [a]ny and all farm equipment and implements I might own at the time of my death, the square dining table and four chairs, any automobiles and all real property owned by me at the time of my death, including but not limited to the following real property located in Sevier County, Arkansas[.]

The 2010 will recited a legal description of several hundred acres of farmland. The residue or remainder of any of D.E.'s property was to go to James. The 2010 will also contained an in terrorem, or no-contest, clause that read:

> In the event any person should contest any provision of this will for any reason, then such person shall take nothing from my estate, instead of the property bequeathed to them hereinabove.

In the months just prior to and following the execution of the 2010 will, D.E. visited with his banker and made changes to multiple financial accounts so that James, James's sons, or Gary would receive the proceeds; the accounts were designated joint accounts or payable-on-death accounts. These changes resulted in significantly more money going to James and his sons than to Gary. However, in one of those account changes, executed in the latter part of 2010, D.E. provided for Gary to receive the proceeds of a $100,000 payable-on-death certificate of deposit.

D.E. died the following year on August 5, 2011, at the age of 89. On August 19, 2011, James petitioned to probate the 2010 will and to be appointed executor of his father's estate. Six days later, on August 25, 2011, Gary cashed in the $100,000 payable-on-death CD.

In November 2011, Gary filed a formal will contest, contending that James was in a confidential relationship with their father and exerted control and undue influence over him. Gary alleged that James breached his fiduciary duty by taking advantage of D.E.'s old age and infirmity and by running D.E.'s farm operation to his (James's) economic benefit. Gary accused James of effectively stealing most of their father's money and property, and consequently, Gary's fair share of the estate of his parents. Gary also alleged that D.E. was incompetent to execute the 2010 will. Later, in a response to a motion for summary judgment, Gary alleged that James procured the 2010 will.

As a bench trial was approaching, James conceded that he was in a confidential relationship with D.E. James lived close to and had a close personal relationship with his

parents, and he helped care for D.E. until his death. Thus, the burden shifted to James to rebut the presumption of undue influence. He denied, however, that he procured the will for his father.

At the bench trial conducted on May 6 and 7, 2013, multiple witnesses testified to D.E.'s mental and physical capabilities and his or her opinion that James did not (and probably could not) exert undue influence over D.E., at or around the time that the 2010 will was signed. Many of those witnesses were people who had no financial interest in the outcome of this will contest. These witnesses included D.E.'s attorney, his CPA, his physician, and his banker. In opposition, Gary and his wife testified to their belief that D.E. was unduly influenced by James and that D.E. lacked testamentary capacity to execute the 2010 will. Gary retained an expert medical witness to examine D.E.'s medical records. The expert witness testified that, given D.E.'s old age, infirmity, and the medications he was taking, D.E. lacked capacity to execute the 2010 will. Several binders of medical documents and financial records were entered into evidence for consideration. The trial judge took the matter under advisement.

On May 9, 2013, the trial judge rendered a letter opinion, followed later by a formal written order, finding the 2010 will valid. The trial judge stated that D.E.'s friends, care givers, banker, accountant, attorney, physician, and the postmaster were all credible witnesses who verified D.E.'s mental capacity and freedom from any undue influence from James. He concluded that James's witnesses were fairly uniform and believable in describing D.E. as "not easily influenced," "strong willed," and a person who "always ran the show." The trial

judge also determined that Gary, his wife, and Gary's expert were unpersuasive. The trial judge concluded that the 2010 will was valid and there was no procurement by James.

Shortly thereafter, Gary petitioned the trial judge (1) to reconsider and vacate his order rejecting his will contest, including consideration of a higher burden of proof for James to present in rebutting the legal presumption of undue influence, and alternatively, (2) if the will was deemed valid, to find that the will's no-contest provision was unenforceable as to Gary because he pursued this will contest in good faith with probable cause. Gary cited to *Seymour v. Biehslich*, 371 Ark. 359, 266 S.W.3d 722 (2007) as controlling authority for applying this good-faith exception. James resisted this petition. Subsequently, the trial judge rejected both of Gary's arguments because the evidence was "overwhelming" in favor of the will's validity; the trial judge found that the no-contest provision of the 2010 will was enforceable and that Gary lacked a good-faith basis to contest the will. This appeal followed.

Gary argues that the trial court erred by applying a preponderance-of-the-evidence standard instead of a "clear" preponderance-of-the-evidence standard to the shifted burden to disprove undue influence.[1] Gary cites to *Birch v. Coleman*, 15 Ark. App. 215, 691 S.W.2d

---

[1]In a typical will contest, the burden of proving the invalidity of a will due to lack of testamentary capacity, undue influence, or fraud is on the contestant. *Parker v. Parker*, 237 Ark. 942, 377 S.W.2d 160 (1964); *Sullivant v. Sullivant*, 236 Ark. 95, 364 S.W.2d 665 (1963). If the proponent of a will, however, procures the making of the will, then a presumption of undue influence arises, and the burden of proof shifts to the proponent to prove beyond a reasonable doubt that the testator had testamentary capacity and was free from undue influence in executing the will. *Hiler v. Cude*, 248 Ark. 1065, 455 S.W.2d 891 (1970); *In re Estate of Garrett*, 81 Ark. App. 212, 100 S.W.3d 72 (2003). If there exists a confidential relationship between the testator and the primary beneficiary, then a rebuttable presumption of undue influence arises. *Simpson v. Simpson*, 2014 Ark. App. 80, 432 S.W.3d 66; *Medlock v. Mitchell*, 95 Ark. App. 132, 234 S.W.3d 901 (2006). Gary does not allege that any of these

875 (1985) for that proposition. Notably, prior to the bench trial, Gary's attorney argued that, given James's confidential relationship with D.E., James was required to rebut the presumption of undue influence by a "preponderance of the evidence," citing to *Breckenridge v. Breckenridge*, 2010 Ark. App. 277, 375 S.W.3d 651, to which James agreed.

The trial court found that James presented *overwhelming* evidence that he (James) did not exert undue influence on his father and that D.E. possessed the mental capacity to execute the 2010 will. We do not reverse in the absence of prejudicial error. *Stalter v. Gibson*, 2010 Ark. App. 801, 379 S.W.3d 710. We affirm on this point.

Gary also argues that the trial court should have deemed his will contest to be in good faith, exempting him from the no-contest clause in his father's will. Although the trial court went so far as to find that, on these facts, Gary did not manifest good faith in his will contest, we need not reach the merits of Gary's argument. Simply put, Arkansas law does not provide for a good-faith exception for a litigant who files what unquestionably constitutes a will contest.

Gary couches the issue clearly in his brief and urges this court to expand *Seymour* to direct will contests:

> **b. Expanding *Seymour* to Direct Contests of Wills.**
> *Seymour* applied the good faith, probable cause exception to what we may conveniently term an "indirect contest" of a will. . . . Here, of course, Gary initiated a "direct contest" of Decedent's 2010 will, arguing it was the product of undue influence and/or that Decedent lacked testamentary capacity. *Seymour's* application of the good faith, probable cause exception does not easily transfer to a direct contest.

---

burdens of proof or persuasion were incorrectly applied here.

For the reasons stated below, we decline to expand the application of *Seymour* to the case at bar.

In *Seymour*, our supreme court answered the narrow question of whether a litigant's filing of a purportedly valid "subsequent will," in opposition to an earlier-filed will, constituted a "will contest" for purposes of triggering a no-contest clause in the earlier will. Ms. Seymour denied that her filing of the subsequent will was actually a will contest; instead, she insisted that the subsequent will was the only valid will to probate. The probate court concluded that Ms. Seymour's filing did, in fact, constitute a will contest, despite her argument to the contrary, and thus she was disinherited by virtue of the no-contest clause in the earlier-filed will. Our supreme court affirmed and held that its decision was "bolstered by cases from other jurisdictions that indicate that such an action, if not taken in good faith, can constitute the kind of challenge that triggers a will's no-contest clause." *Seymour*, 371 Ark. at 364, 266 S.W.3d at 726. The supreme court concluded that there was "ample evidence in the record demonstrating that Ms. Seymour was not acting in good faith when she proffered the later will," and that it was proper to conclude that her actions "triggered the no-contest clause" in her father's earlier will. *Id.*, 371 Ark. at 367, 266 S.W.3d at 728.

The situation before us today is very different because Gary filed a direct will contest against his father's 2010 will. The 2010 will undisputedly contained a no-contest clause. As noted by our supreme court in *Seymour*, Arkansas courts have recognized the validity of no-contest clauses dating back to at least 1937, citing to *Ellsworth v. Arkansas National Bank*, 194

Ark. 1032, 109 S.W.2d 1258 (1937). The *Seymour* opinion also cited to *Lytle v. Zebold*, 235

Ark. 17, 18–19, 357 S.W.2d 20 (1962), where the supreme court held as follows:

> Since the testator may leave his property to anyone he chooses he is at liberty to exclude from his bounty those beneficiaries who unsuccessfully seek to thwart his testamentary wishes.

*See also Jackson v. Braden*, 290 Ark. 117, 717 S.W.2d 206 (1986).

There is nothing in this case to distinguish it from the myriad of cases enforcing no-contest clauses. Gary made a direct and unsuccessful attack on his father's 2010 will. There is no good-faith exception to a direct attack on a will that contains a no-contest clause. We decline to expand *Seymour* as argued by appellant. We therefore do not reach the merits of Gary's arguments that his will contest was taken in good faith and that the no-contest clause should not be enforced.[2]

For the foregoing reasons, we affirm.

WHITEAKER, J., agrees.

BROWN, J., concurs.

*Norton & Wood, L.L.P.*, by: *Cory J. Floyd* and *Justin Bradford Smith*, for appellant.

*Hatfield, Sayre & Brockett*, by: *Richard F. Hatfield*, for appellee.

---

[2]We are fully cognizant that the concurring judge would apply the *Seymour* "good faith exception" to the facts of this case, and we respectfully disagree with his opinion on that issue.